IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| TIFFANY R. BUTZ and JANICE M. PERRY, on behalf of themselves and all those similarly situated who consent to representation,<br><br>Plaintiffs,<br><br>v.<br><br>AMWARE DISTRIBUTION WAREHOUSES OF GEORGIA, INC., and AMWARE LOGISTICS SERVICES, INC.,<br><br>Defendants. | 1:13-cv-3204-WSD |

## OPINION AND ORDER

This matter is before the Court on Plaintiffs' Motion for Court Supervised

Notice to a Conditional Collective Action ("Motion") [18] [1] and Plaintiffs' Motion

for Extension of Time to Complete Discovery [36].

## I.   BACKGROUND

This is a putative collective action brought by Plaintiffs Tiffany Butz

("Butz") and Janice Perry ("Perry") (together, "Plaintiffs") against Amware

Distribution Warehouses of Georgia, Inc. ("Amware Distribution") and Amware

---

[1] The Motion is more reasonably characterized as one for conditional certification as a collective action and Court-approved notice to potential class members.

Logistics Services, Inc. ("Amware Logistics") (together, "Defendants"). Plaintiffs claim Defendants failed to pay overtime compensation to Plaintiffs for hours worked in excess of forty (40) hours per week, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq.

To support their Motion, Plaintiffs submit their individual declarations (Mot. Exs. C, D) and a printout of a page from Amware Logistics' website on which appears a "List of Facilities" (Mot. Ex. E). In opposition, Defendants submit the declaration of Deborah Mullins, Amware Distributions' General Manager. (Resp. Ex. 1).

A.    Butz testimony[2]

Butz asserts she was "employed with Amware Logistics and Amware Distribution . . . [sic] approximately May of 2012 until August 31, 2013." (Mot. Ex. C ¶ 2). From May 2012 until January 2013, Butz was employed as a "'Customer Service Representative' at Defendants' warehouse located . . . [in] Morrow, Georgia." (Id. ¶ 3). She states that "[d]uring a portion of this time period [she] was given the title of Office Manager, but continued to consistently perform the duties of a Customer Service Representative" claiming that she "never

---

[2] Butz' declaration is qualified. In its preamble, Butz states "this declaration [is] based upon my own personal knowledge, except where otherwise specified." (Mot. Ex. C ¶ 1).

performed the duties of an Office Manager." (Id.).  Butz asserts that in January

2013, "Defendants changed all Customer Service Representatives to the new title

of 'Account Manager.'" (Id. ¶ 4).  She states: "[A]s a Customer Service

Representative and/or Account Manager, my duties were administrative, and all

centered on the fulfillment of customer orders from our warehouse." (Id. ¶ 5).  She

was responsible for "inputting data in our computer system" to records shipments

of products.  She did not schedule deliveries but "merely recorded them in our

inventory when they arrived."  In connection with fulfillment, her job "consisted of

receiving customer orders for their stock, entering the orders into the computer

system, forwarding the 'tickets' . . . to the warehouse . . . entering data from bills

of lading and notifying customers when their product was placed with the carriers."

She offered further that "[a]ll of the Customer Service Representatives and

Account Managers performed duties substantially similar to [hers], the only

difference being that "each representative or manager was assigned specific clients

to process." (Id. ¶ 5).  She did not identify where these other employees worked or

the basis for her statement that they all were similarly situated.

Butz states she "did not have any independent judgment when performing

[her] duties" and that the "process was automated and the same for every customer

order." (Id. ¶ 6).  She did not have "discretion to deviate from prescribed

3

processes."  (Id. ¶ 7).  Butz states she "was not a member of management and did

not supervise any employees"  and was "required to work 40 hours per week."  (Id.

¶ 8).

From May to July of 2012, Butz was paid $11.50 per hour, and $17.25 per

hour for overtime hours worked.  (Id. ¶ 9).  After "late July or early August [year

not provided]" Butz began receiving a bi-weekly salary and was no longer paid

overtime.  This was her compensation arrangement through the end of her

employment.  (Id. ¶ 10).

Butz stated that she and "other Customer Service Representatives and

Account Managers regularly worked hours in excess of 40 per week," but were not

paid overtime.  (Id. ¶ 11).

If she worked less than 40 hours in a week, the time for which Butz was paid

was reduced to reflect the time not worked.  She claims she worked through lunch

on "many occasions" and "believe[s she] was not paid for this time."  (Id. ¶ 12).

In January 2013, Butz states, there was a meeting during which "Amware

management" explained the change in title from Customer Service Representative

to Account Manager.  At the meeting "employees complained that they were not

being paid overtime even though their time was taken away from them if they

worked less than 40 hours per week."  (Id. ¶ 13).  Butz states that "Amware refused

4

to pay us overtime." (Id.).

Butz states: "Based on conversations with management of Defendants, I am aware that the Defendants have a policy of paying salaries to Customer Service Representatives and/or Account Managers and not paying employees overtime." (Id. ¶ 15). She states further: "[B]ased on my observations and experience, I believe that that [sic] there are at least 30-50 current and former employees who performed similar duties to me [sic] who worked at the approximately 18 other facilities operated by Amware." (Id.).

B.   Perry testimony

Perry states she was employed by Defendants at the Morrow, Georgia facility from September 2006 through October 9, 2013. (Mot. Ex. D ¶ 3). From September 2006 to August 2012, Perry served as a Customer Service Representative performing "administrative duties related to warehouse fulfillment, including the receipt and recording of orders from designated customers for the delivery of stock being stored in [the] warehouse facility." (Id. ¶ 4). She "received electronic notification of the orders from the customers, and forwarded orders to the warehouse to be filled and shipped to locations as designated by the customers." (Id.). Her duties "did not include those related to management" and she did not "supervise any other employees and did not participate in management

meetings or decision-making."  (Id. ¶ 5).

In August 2012, Perry became a "contract consultant" and served in that position until January 14, 2013, performing the duties of a Customer Service Representative and training another employee to "perform these duties."  (Id. ¶ 6). As a "'contractor' [Perry] was paid overtime for hours [she] worked in excess of 40 hours per week."  (Id.).

From January 14, 2013 through October 9, 2013, Perry was an Account Manager and "performed all of the exact same duties [she] did as a Customer Service Representative."  (Id. ¶ 7).

Perry states that she "did not have the opportunity to exercise independent judgment or the discretion to deviate from prescribed procedures for accepting and processing customer orders."  (Id. ¶ 9).

As a "Customer Service Representative and Account Manager, [Perry] was paid on a salary basis."  (Id. ¶ 10).  She was not paid overtime although she claims she regularly worked more than 40 hours per week.  (Id.).  Her pay, she states, was "docked" when she was absent from work for less than a full day and this practice was applied "to all other Customer Service Representatives and Account Managers."  (Id. ¶ 11).  Perry states that there were many occasions "when [she] and other employees had to work through lunch" and they were not compensated

for this time.  (Id. ¶ 12).

Perry states that "Amware Logistics Services, Inc. . . . and Amware Distribution Warehouses of Georgia, Inc. . . .  provide warehousing, packaging, fulfillment and transportation services to third-parties."  (Id. ¶ 13).  While employed, Perry claims, she became familiar with "the structure and relationship between Amware Logistics and Amware Distribution."  (Id. ¶ 14).  She states they have common office space in Colorado, the same Chief Executive Officer, and a common Chief Financial Officer.  (Id.).  Perry asserts that "Amware Logistics' management team and her former supervisory chain of command for the Morrow warehouse facility are the same."  (Id. ¶ 15).

Perry "understand[s] that Amware Logistics management controlled and directed the day-to-day operation of Amware Distribution, including [the] terms and conditions of [Perry's] employment."  (Id. ¶ 16).  "Amware Logistics also controls, oversees, and directs the day-to-day operation of approximately eighteen (18) other facilities at which it employs employees in the position of Customer Service Representative and/or Account Manager."  (Id.).  Perry's "understanding has been that these employees perform duties similar to the duties performed by [Perry], and that they are paid in the same manner that [Perry] was paid.  (Id.).  Perry claims "[her] understanding is supported by Defendant's [sic] website at

www.amwarelogistics.com, a true and accurate copy of which [appears at] Exhibit E." (Id.).

Perry states that "[b]ased on [her] observations and belief there are at least 30 to 50 former and/or current employees employed by Defendants in the Customer Service Representatives and/or Account Managers positions, who performed similar duties to [Perry]."  (Id. ¶ 17).

C.     Mullins Testimony[3]

Mullins is Amware Distribution's General Manager and has served in that position since April 12, 2012.  (Resp. Ex. 1 ¶ 2).  She oversees all of Amware Distribution's operations at its only facility in Morrow, Georgia.  The company provides "warehousing and fulfillment services, which includes filling and shipping its orders from the inventory it maintains for its customer at [its Morrow, Georgia] warehouse.  (Id.).

Mullins states that Amware Distribution is a subsidiary of Amware Logistics.  Of the eighteen companies listed in Exhibit E referenced in Perry's declaration, eight of the facilities are public warehousing and fulfillment facilities. The others are "contract warehouses that provide entirely different services than Amware Distribution."  (Id. ¶ 4).  "Individuals working in the Customer Service

---

[3] Mullins testimony was based on her personal knowledge.

Representative position for the contract warehouses are paid an hourly rate for all hours worked, including an overtime premium for all hours worked over 40 in a workweek." (Id.).

Mullins states that Butz worked at Amware Distribution's Morrow, Georgia facility "[f]rom May 7, 2012 until approximately November 5, 2012, . . . as [sic] Customer Service Representative." (Id. ¶ 5). "[F]rom May 7, 2012 until August 31, 2012, . . . Butz was paid an hourly rate for all hours worked, including an overtime premium of one and one-half her hourly rate for all hours worked in a workweek." (Id.). "Beginning September 1, 2012, . . . Butz was paid a salary for all hours worked. (Id.).

"On November 5, 2012, . . . Butz was promoted to the position of Office Manager, of the Morrow facility." (Id. ¶ 6). In this position she "was responsible for support [Mullins] in [her] daily job duties, which included oversight of all the accounts serviced at the Morrow facility." (Id.). She was responsible for "reviewing and setting rates for new accounts, assigning accessorial billing rates for storage and handling, setting renewal rates for existing accounts, and completing weekly billing for the Morrow facility." (Id.). Butz also "scheduled and led meetings with the staff at the Morrow facility, and counseled and issued written corrective actions when necessary." (Id.).

9

On January 14, 2013, Mullins states, Butz stepped down as Office Manager and reassumed the "duties of a [Customer Service Representative] at the Morrow facility" although Butz was also "designated the Team Lead of the Morrow facility and continued many of the day-to-day responsibilities she had as the Office Manager." (Id. ¶ 7).  She was "responsible for analyzing customer accounts and evaluating the appropriate process to satisfy the needs of each customer, which included working with [Amware Distribution's] carriers to assign loads depending on a customer's scheduling needs."  (Id.).  She was "responsible for managing and resolving customer complaints, which included . . . providing instruction to warehouse staff to resolve customer complaints and to resolve inventory discrepancies, and providing advice and input into standard operating procedures." (Id.).

Mullins states that Perry was employed as a Customer Service Representative at the Morrow facility from June 29, 2004 until June 11, 2012, and again from January 14, 2013 until she resigned on October 9, 2013.  (Id. ¶ 8).  At all times during her employment Perry was paid a salary.  (Id.).  "She was responsible for servicing [Amware Distribution's] largest account" including "analyzing th[e] customer's account and determining how to meet the needs of [the] customer, which included building orders to be filled from multiple locations,

10

and scheduling and routing carriers to ensure that orders were filled within the set time limits." (Id.).  She had "daily communication with [the] client to manage and resolve any complaints." (Id.).

From August 2, 2012, through January 13, 2012, Perry was a contractor to Amware Distributors and, pursuant to her contract, she was paid an hourly rate with an overtime premium of one and one-half times her hourly rate.  (Id. ¶ 9).

### D.    Amware Logistics' Facilities

Plaintiffs' Exhibit E list eighteen (18) facilities.  Six (6), including the Morrow, Georgia facility at which Plaintiffs worked, are described as a "Warehouse/Fulfillment Facility."  Two (2) are described as a "Public Warehouse/Fulfillment Facility."  Ten (10) are described as a "Contract Warehouse."  Printouts from the Amware Logistics website show "Management" of the following facilities: Morrow, Georgia; Atlanta, Georgia; Lawrenceville, Georgia; Cranbury, New Jersey; Dallas, Texas; New Haven, Connecticut; Phoenix, Arizona; and Toronto, Canada.  Although a different General Manager is listed for each facility, Hugh Tait, Kristie Jeng and Keith Mixon are listed as the "Executive Vice President," Vice President, and Vice President of I.T., respectively, for every facility.  (Reply Exs. F-O).

## II.   DISCUSSION

### A.   Motion to Conditionally Certify Collective Action

Plaintiffs move to conditionally certify a collective action pursuant to the

FLSA, 28 U.S.C. § 216(b), on behalf of "Customer Service Representatives and/or

Account Managers" who worked for Defendants since September 26, 2010.

### 1.   *Legal Standard*

The FLSA requires covered employers to pay non-exempt employees who

work more than forty hours in a week an overtime rate of one and one-half times

the employee's regular pay rate for all hours worked that exceed forty.  Id.

§ 207(a).  Section 216(b) imposes liability on employers for violations of Section

207 and authorizes employees to bring lawsuits to recover that liability.

Employees may sue individually or they may bring a collective action on behalf of

themselves and other "similarly situated" employees:

> An action . . . may be maintained against any employer (including a public
> agency) in any Federal or State court of competent jurisdiction by any one or
> more employees for and in behalf of himself or themselves and other
> employees similarly situated.  No employee shall be a party plaintiff to any
> such action unless he gives his consent in writing to become such a party
> and such consent is filed in the court in which such action is brought.

Id. § 216(b).  In contrast to a class action under Federal Rule of Civil Procedure 23,

which generally requires potential plaintiffs to opt-out if they do not wish to be

represented in the lawsuit, a collective action under Section 216(b) requires

potential plaintiffs to affirmatively opt into the lawsuit.  Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1216 (11th Cir. 2001).  "The decision to create an opt-in class under § 216(b) . . . remains soundly within the discretion of the district court."  Id. at 1219.[4]

The Eleventh Circuit encourages district courts to perform a two-step process to certify a collective action under Section 216(b).  Id.  In the initial, so-called "notice stage," the question is whether notice of the action should be given to potential class members.  Id. at 1218 (quoting Mooney v. Aramco Servs. Co., 54 F.3d 1207, 1213 (5th Cir. 1995)).  Relying on the pleadings and affidavits submitted by the parties, the court applies a "fairly lenient standard" that "typically results in 'conditional certification' of a representative class."  Id. (quoting Mooney, 54 F.3d at 1213-14).  Plaintiffs bear the burden of establishing that they are "similarly situated" to the employees they seek to represent.  Beecher v. Steak N Shake Operations, Inc., 904 F. Supp. 2d 1289, 1297 (N.D. Ga. 2012).  Unsupported, generalized allegations of similarly are not sufficient.  Id. at 1297-98.  The plaintiffs may meet this burden, which is not heavy, "by making substantial allegations of class-wide discrimination, that is, detailed allegations supported by

---

[4] Hipp involved a collective action under the Age Discrimination and Employment Act of 1967.  That statute incorporates the FLSA's collective action provision, and Hipp therefore applies in both contexts.  Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1259 n.37 (11th Cir. 2008).

affidavits which successfully engage defendants' affidavits to the contrary." Id. (quoting Grayson v. K Mart Corp., 79 F.3d 1086, 1097 (11th Cir. 1996)). Plaintiffs are required only to show that they and the potential class-members are similarly, not identically, situated. Grayson, 79 F.3d at 1096. They are not required to show they were subjected to a common or unified policy, plan, or scheme, see id. at 1095, although this is a common and effective way to satisfy the "similarly situated" requirement. Plaintiffs "must [at least] make some rudimentary showing of commonality between the basis for [their] claims and that of the potential claims of the proposed class, beyond the mere facts of job duties and pay provisions." Beecher, 904 F. Supp. 2d at 1298 (quoting Williams v. Accredited Home Lenders, Inc., No. 1:05-cv-1681-TWT, 2006 WL 2085312, at *3 (N.D. Ga. July 25, 2006)); see also Barron v. Henry Cnty. Sch. Sys., 242 F. Supp. 2d 1096, 1103 (M.D. Ala. 2003) ("[W]hile a unified policy, plan, or scheme of discrimination may not be required to satisfy the more liberal similarly situated requirement, some identifiable facts or legal nexus must bind the claims so that hearing the cases together promotes judicial efficiency.").

If the Court conditionally certifies a class, potential class members receive notice and an opportunity to opt into the class and the parties complete discovery. Hipp, 252 F.3d at 1218 (quoting Mooney, 54 F.3d at 1213-14). Whether notice

shall be given also focuses on whether there are other employees who would desire to opt-in, and who are "similarly situated" to plaintiffs.  See Dyback v. State of Fla. Dep't of Corr., 942 F.2d 1562, 1567-68 (11th Cir. 1991).  Plaintiffs must show there are other employees who wish to opt in and that these other employees are similarly situated.  See Delano v. MasTec, Inc., No. 8:10-cv-320-T-27MAP, 2011 WL 2173864, at *4 (M.D. Fla. June 2, 2011).  "A plaintiff's or counsel's belief in the existence of other employees who desire to opt in and 'unsupported expectations that additional plaintiffs will subsequently come forward are insufficient to justify' certification of a collective action and notice to a potential class."  Id. (quoting Mackenzie v. Kindred Hosps. East, L.L.C., 276 F. Supp. 2d 1211, 1220 (M.D. Fla. 2003)) (citing Haynes v. Singer Co., Inc., 696 F.2d 884, 887 (11th Cir. 1983)).

The second stage is optional and usually occurs if the defendant moves for "decertification" after the completion of all or most discovery in the case.  Hipp, 252 F.3d at 1218 (quoting Mooney, 54 F.3d at 1213-14).  Based on the more extensive factual record, the court makes a factual determination whether claimants are similarly situated.  Id. (quoting Mooney, 54 F.3d at 1213-14).  If they are, the collective action proceeds on the merits.  If not, the court decertifies the class, the opt-in plaintiffs are dismissed without prejudice, and the original plaintiffs proceed

on their individual claims.  Id. (quoting Mooney, 54 F.3d at 1213-14).

There is nothing in this case that indicates the Court should not follow the two-stage approach encouraged by the Eleventh Circuit.  In some cases where there is factual information available to evaluate the similarity of potential class member claims, courts will combine the first and second stages and apply the more stringent second stage standard.  See, e.g., Williams, 2006 WL 2085312 at *4 (combining first and second stage where plaintiffs disseminated informal notice to potential opt-in plaintiffs and substantial discovery had been completed).  The facts are not yet sufficiently developed in this matter to justify this higher standard.

2.    *Analysis*

After discussing the legal framework for evaluating whether to conditionally certify a collective action, Plaintiffs conclusorily state: "Applying these principles to the case, it is clear that Plaintiffs have met their burden to show that they are similar [sic] situated to other Customer Service Representatives and Account Managers."  (Pls' Br. in Supp. at 13).  They state further:  "According to Plaintiffs' testimony [in their declarations], the Defendants treated all of these employees the same in the terms of their compensation."  (Id.).  In their Reply, Plaintiffs argue that the Court's "inquiry is simply whether, based on the plaintiffs' allegations, they were subjected to the same unlawful pay plan and whether it appears likely

16

that other similar employees will consent to join the action."  (Reply at 1-2).  To

support conditional certification, Plaintiffs submit that all persons at all Amware

Logistics facilities who hold the title Customer Service Representative or Account

Manager are subject to the same pay plan.  Plaintiffs assert that they are similarly

situated and can represent members of this purported collective action because

they, at times, had the same position titles and they "believe" there are others who

would join the collective action if given notice.  Plaintiffs seek to represent "[a]ll

current and former Customer Service Representatives and Account Managers

employed by Amware, who worked for Amware in the United States at any time

from September 26, 2010, through the close of the opt-in period."  (Pls' Br. in

Supp. at 2).

a.   <u>Scope of the class</u>

Plaintiffs, of course, bear the burden of demonstrating a reasonable basis to

conclude that they are similarly situated to the members of the proposed collective

action.  Cf. <u>Grayson</u>, 79 F.3d at 1097.  The burden can be met "by making

substantial allegations of class-wide discrimination, that is, detailed allegations

supported by affidavits which successfully engage defendants' affidavits to the

contrary."  <u>Id.</u>  Plaintiffs "must [at least] make some rudimentary showing of

commonality between the basis for [their] claims and that of the potential claims of

17

the proposed class, beyond the mere facts of job duties and pay provisions."
Beecher, 904 F. Supp. 2d at 1298 (citations omitted).  "[W]hile a unified policy, plan, or scheme of discrimination may not be required to satisfy the more liberal similarly situated requirement, some identifiable facts or legal nexus must bind the claims so that hearing the cases together promotes judicial efficiency."  Barron v. Henry Cnty. Sch. Sys., 242 F. Supp. 2d 1096, 1103 (M.D. Ala. 2003).

The question is whether Plaintiffs have met this rather lenient burden here based on the allegations in their Complaint and the evidence submitted in support of their Motion.  Plaintiffs rely on their declarations to support the commonality of the job duties of Customer Service Representatives and Account Managers.  Butz asserts that all Customer Service Representatives perform duties substantially similar to hers, but she provides no basis to support that she is aware of the duties performed at any location other than her own.  Butz does not discuss duties at any location other than her own, does not state that she visited any location other than her own, and does not state she attended meetings with other Customer Service Representatives who worked at the seventeen locations other than her Morrow, Georgia location.  Perry's one-sentence statement on comparable job duties is even less certain, and also is made without any foundation for the statement offered.  Her declaration testimony was simply that her "understanding has been that these

18

employees perform duties similar to the duties performed by [her] and that they are paid in the same manner the [she] was paid."  (Mot. Ex. D ¶ 16).

A close reading of the declarations show that Plaintiffs offered their opinion on what they observed occurring in their Morrow, Georgia location and supports that any statements offered were based on their experience in Morrow.  Tellingly, Perry stated that she and other employees worked through lunch and they were not compensated for that time—a statement necessarily based on her work experience in Morrow.  She makes a similar comment about her and other employees' pay being docked when they were absent from work for less than half a day.

On the evidence before the Court, there is not a sufficient factual basis to support that employee duties or treatment at locations other than the Morrow, Georgia facility were similar to the duties or treatment of Customer Service Representatives or Account Managers in Morrow, Georgia.  It is not enough, as Plaintiffs intimate, to show that several of the facilities have the same description and the same senior managers to infer similarity of operations or policies, especially when each location has a different on-site general manager.[5]

---

[5] The description of twelve of the 18 locations listed on Exhibit E alone are so distinctly different from the "Warehouse/Fulfillment Facility" description of the Morrow, Georgia facility to preclude even an inference that employees there had duties similar to those of the Plaintiffs.

The Court is unable to find on the record here sufficient commonality between the requested class members to define a class of employees other than those at the Morrow, Georgia location.

      b. <u>Plaintiffs as representatives of other "similarly situated" employees in Morrow, Georgia</u>

Plaintiffs have the following periods of employment with Amware Distribution, under the following job titles and with the following compensation:

| | **Period** | **Position** | **Compensation** |
|---|---|---|---|
| **Butz** | May 7, 2012 to July 2012 | Customer Service Representative | Hourly rate plus an overtime premium |
| | August 2012 to January 2013 | Customer Service Representative; undisclosed period as Office Manager | Salary; no overtime pay |
| | January 2013 to August 2013 | Account Manager | Salary; no overtime pay |
| **Perry** | September 2006 to August 2012 | Customer Service Representative | Salary; no overtime pay |
| | August 2012 to January 2013 | Independent Contractor | Hourly rate plus an overtime premium |
| | January 2013 to October 2013 | Account Manager | Salary; no overtime pay |

In comparing these job titles and Plaintiffs' pay arrangements, the following is disclosed:  Butz and Perry each had the title of Customer Service Representative but their pay arrangements were different at times.  Butz was paid an hourly wage with premium pay for overtime worked for a period of time.  Perry was paid a salary throughout her employment as a Customer Service Representative.

For about six months, Perry was an independent consultant to Amware Distribution, was compensated at an hourly rate, and earned overtime pay.  Butz did not work in an independent consultant role.  Butz also was given the title Office Manager for an undisclosed period of time.  Perry did not serve as an office manager.

Plaintiffs allege they seek to represent Customer Service Representatives and Account Managers who were not paid overtime.  They served, however, during the time period for the claims they allege, in positions that were not employee positions or which did not have the same job titles as the class of employees they claim were not paid overtime and which they seek to represent.

Plaintiffs allege they may adequately represent this class of employees because they are similarly situated.  The Court concludes they are not.  Plaintiffs' employment history is not representative of the class they purport to represent.  Their circumstances are different than those of the class alleged.  Butz claims that

before August 2012, as a Customer Service Representative, she received an hourly

wage and overtime.  She does not adequately represent Customer Service

Representatives whom Plaintiffs assert were not paid overtime compensation.[6]

During the time Perry was an independent contractor, Perry was not even an

employee of Defendants.  In short, neither Plaintiff has presented evidence that

they are similarly situated to or that their claims are representative of the class they

seek to represent.  The Court necessarily concludes that this action should not be

certified as a collective action.  Plaintiffs are entitled, however, to assert individual

claims under the FLSA for failure to pay them overtime pay.

B.    Plaintiffs' Motion to Extend Discovery

Plaintiffs also have moved to extend time to complete discovery.  From their

motion, which is unopposed, the Court understands that the parties have had

difficulty conducting the depositions of the Rule 30(b)(6) representative of each

---

[6]  Butz claims it was only beginning in August 2012, and not before, that she began
receiving a salary as a Customer Service Representative.
    To the extent Plaintiffs appear to allege that in January 2013, there was a uniform
change of job titles from Customer Service Representative to Account Manager
and a reclassification from hourly pay to salary, neither Plaintiff experienced the
change in pay structure.  Butz was already receiving a salary.  Perry was not
employed by either of the Defendants between August 2012 and January 14, 2013,
and worked instead as a contractor for Amware Distribution.  Before August 2012,
she worked as a Customer Service Representative, but even in this position she
was paid a salary.

Defendant,[7] Deborah Mullins, Hugh Tait and Kristie Jeng (the "Depositions"). Plaintiffs have requested thirty (30) additional days to conclude this deposition discovery. Their request is granted. The parties shall discuss and agree upon a schedule to conduct the Depositions and shall submit the schedule to the Court on or before April 30, 2014.

## III.   CONCLUSION

Plaintiffs have not provided facts sufficient to show a class of similarly situated employees and Plaintiffs' claims are not representative of the class they seek to represent. For these reasons and those stated above,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Court Supervised Notice to a Conditional Collective Action [18] is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Extension of

---

[7] Defendants assert a one-sentence objection to the Rule 30(b)(6) notices served on Defendants. Their objection states:

Defendants object to the topics in Plaintiffs' Amended Rule 30(b)(6) deposition notice on the grounds that they are unduly broad, overly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and beyond the scope of discovery authorized by the Court.

(Defs' Resp. & Objs. [35]). Defendants claim the Amended Notice is not consistent with the Court's limitation of the scope of discovery as stated during the March 31, 2014, telephone conference. (Id. at n. 1). Plaintiffs should, on or before April 23, 2014, state the issues on which Rule 30(b)(6) witnesses testimony is requested. The statement of issues is required to be consistent with the Court's March 31, 2014, limitations on the scope of discovery.

Time to Complete Discovery [36] is **GRANTED.**  The parties **SHALL**, on or before April 30, 2014, submit a joint deposition schedule.

**SO ORDERED** this 16th day of April, 2014.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE